**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL WOMEN'S DAY** | ) | |
| **MARCH PLANNING COMMITTEE,** *et* | ) | |
| *al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.  SA-07-CA-971-XR** |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **CITY OF SAN ANTONIO** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

On November 29, 2007, the San Antonio City Council adopted a new ordinance regulating marches and parades on public streets within the city.

Plaintiffs object to the ordinance, alleging it unduly burdens the exercise of their First Amendment freedoms. Plaintiffs also contend that the council's exemption of certain groups from the new fee requirements constitutes impermissible content/viewpoint discrimination.

Having considered the written and oral arguments of the parties, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for Preliminary Injunction (Docket No. 2).

**Factual and Procedural Background**

Historical Background

On November 29, 2007, the San Antonio City Council enacted Ordinance 2007-11-29-1193 (hereinafter "ordinance"), creating City Code Chapter 19, Article XVII (Parades, Runs, Walks, and Related Events). The ordinance replaces two pre-existing ones, the first of which dealt with runs and walks, the second with parades. These ordinances (hereinafter "old

ordinances") required event organizers to obtain permits from the City. Permittees of events designated as "nonpolitical in nature" were required to pay for the costs of barricading, policing, and cleaning-up.[1] Events designated as being of a "political nature" were exempted from these costs.[2] The term "political nature" was not defined,[3] but Plaintiffs contend city officials interpreted it to apply only to election related events.[4]

After much consultation with stakeholders in the city, the city council passed the new ordinance in an effort to streamline the City Code and provide for fee waivers for First Amendment events.[5]

Permitting Requirements

Like the old ordinances, the present one requires organizers of public marches and parades to apply to the chief of police or his designee to obtain a permit. There is a flat rate fee of $75 for the administrative costs of applying for a permit.

In addition to the flat rate permit fee, the new ordinance holds permit holders responsible for the costs of "1) providing traffic control devices for the procession route . . . ; 2) providing traffic control personnel, whether on duty or on overtime, for the procession route; and 3) cleaning up the procession route."[6]

---

[1] Docket No. 22, Plaintiffs' First Amended Complaint at ¶ 7.

[2] *Id.*

[3] Docket No. 11 at 2.

[4] Docket No. 22, Plaintiffs' First Amended Complaint at ¶ 8.

[5] Docket No. 11 at 2.

[6] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(b) (2007).

These and other permitting requirements do not apply, however, to:

1) funeral processions or escorts;

2) a governmental agency acting within the scope of its functions;

3) the movement of persons in an orderly, formal manner from a point of origin to a point of termination on a sidewalk, so long as the movement does not impede the normal flow or regulation of pedestrian or vehicular traffic; or

4) a public assemblage that does not involve the movement of persons in an orderly, formal manner from a point of origin to a point of termination.[7]

First Amendment Processions

For purposes of considering permit applications, the ordinance distinguishes between First Amendment activity and non-First Amendment activity. The ordinance defines "First Amendment activity" as "all expressive and associative activity that is protected by the United States and Texas Constitutions, including speech, press, assembly, and the right to petition, but not including commercial advertising."[8] For First Amendment events, the City subsidizes the first $3,000 of traffic control costs.[9]

Subsidization of Costs for Certain Events

Additionally, the ordinance directs that for certain specified events, the City will absorb the costs associated with traffic control. The relevant text reads:

Because of its broad appeal, historic tradition, cultural significance, and other public benefits provided by the Deiz y Seis Parade, the city shall cover the costs of traffic control personnel. Because of their broad appeal, historic tradition, cultural significance, association with a national holiday or a day given statewide

---

[7] *Id*. at § 19-632.

[8] *Id*. at § 19-630.

[9] *Id*. at § 19-636(b).

recognition, and other public benefits provided by the Martin Luther King March and the Veterans Day Parade, the city shall cover the costs of traffic control personnel and traffic control devices.[10]

<u>Plaintiffs and their Claims</u>

Plaintiffs are the International Woman's Day March Planning Committee and the San Antonio Free Speech Coalition, groups that organize marches and events that qualify as First Amendment processions.[11] On November 29, 2007, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking to stop enforcement of the new ordinance for constitutional reasons. On December 20, 2007, the Court held a hearing on the motion (hereinafter "hearing"), at which witnesses testified and were examined by both parties.

Plaintiffs allege five grounds for why the new ordinance is unconstitutional. First, they contend the ordinance vests too much discretion in the chief of police to make cost assessments. Second, they argue the ordinance allows the chief of police to engage in content-based discrimination by charging for security costs. Third, they allege the City commits content and viewpoint discrimination by covering the costs of certain First Amendment events, while not subsidizing the costs of others. Fourth, they contend the City engages in content discrimination by excluding from the ordinance's coverage funeral processions and governmental agencies acting with the scope of their functions. Fifth, and finally, they argue the assessment of traffic control and clean-up costs imposes an unconstitutionally high barrier to speech without providing

---

[10]  *Id*. at § 19-636(c).

[11] Plaintiffs have conducted marches in the past and plan to hold a public procession on or around March 8, 2008 in celebration of International Women's Day. Accordingly, the Court finds they have standing to challenge the constitutionality of the ordinance, which sets forth the requirements for marches and other processions.

ample alternatives for groups that cannot afford these costs.

In addition to the briefings of the parties, the ACLU Foundation of Texas filed an amicus curiae brief on behalf of Plaintiffs. Because of the nature of the relief requested, and because Plaintiffs have stated their intent to organize an International Women's Day March on or around March 8, 2008, the Court has provided expedited consideration of Plaintiffs' motion.

### Standard of Review

Because Plaintiffs have brought a facial challenge against the new ordinance, the Court must consider the City of San Antonio's "authoritative constructions of the ordinance, including its own implementation and interpretation of it."[12]

Furthermore, because Plaintiffs seek a preliminary injunction, they have the burden of establishing 1) a substantial likelihood of success, 2) a substantial threat of irreparable harm, 3) that the threatened injury to them outweighs any threatened harm to the Defendant, and 4) that granting the injunction will not disserve the public interest.[13]

Throughout the analysis that follows, it is important to bear in mind that the ordinance regulates access to the public streets. As the Supreme Court long ago held, streets "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[14]

---

[12] Forsyth County, Georgia v. Nationalist Movement, 505 U.S. 123, 131 (1992).

[13] Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 572-3 (5th Cir. 1974).

[14] Hague v. Committee for Industrial Organization, 307 U.S. 496, 515 (1939).

**Analysis**

Organization of Plaintiffs' Claims

Plaintiffs' five bases for relief can be summarized in two categories: 1) challenges to the City's allocation or use of discretion and 2) concerns that the City has erected an impermissibly high burden to speech. With respect to discretion, Plaintiffs contest the city council's decision to subsidize the traffic control costs for some events, as well as its decision to exclude some categories of events from the permit system altogether. They also challenge the discretion vested in the chief of police to determine the traffic costs (and alleged security costs) assessed to those groups not exempt from the ordinance. Finally, even ignoring the discretion-related claims, Plaintiffs aver that the ordinance makes exercise of fundamental First Amendment freedoms cost prohibitive for a number of resource-limited groups such as themselves.[15]

Amount of Discretion Vested in the Chief of Police

The Court starts by examining whether the new ordinance vests in the chief of police overly broad discretion to determine how much to charge for a march or parade.

The ordinance requires persons or groups seeking a procession permit[16] to "file an

_____

[15] Amicus raises additional arguments to those pled by Plaintiffs. These include the contentions that 1) the ordinance's distinction between First Amendment and non-First Amendment activity renders it impermissibly vague and overbroad; 2) the ordinance's provisions governing notice and permit issuance are not narrowly tailored; and 3) the ordinance in its entirety is void for vagueness. Because these claims were not pled by Plaintiffs, they are not addressed in this Order.

[16] The new ordinance defines procession as "a group of persons moving along, by whatever means, in an orderly, formal manner on any street, alley, or public thoroughfare from a point of origin to a point of termination or a group of persons moving along, by whatever means, in an orderly, formal manner anywhere else in the city from a point of origin to a point of termination in such a way as to impede the normal flow or regulation of pedestrian or vehicular traffic." SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-630 (2007).

application with the chief of police on forms provided by such officer."[17] Permit holders are responsible for the costs of traffic control officers, traffic control devices, and clean-up expenses. The chief of police is responsible for assessing costs based on a procession's "proposed route, time of day, time of year, and anticipated number of individuals in procession."[18] The chief of police is tasked with ensuring "traffic control personnel [are] in a number sufficient to adequately safeguard the safety of the event participants and the general public."[19]

Plaintiffs cite to the Supreme Court's opinion in *Forsyth County*[20] to support their argument that the ordinance vests too much discretion in the chief of police to determine the costs imposed on parties wishing to exercise their freedom of speech rights in the public streets.

Defendant responds that the cost-setting factors articulated in the ordinance are based on factors constitutionally upheld by the Sixth Circuit in *Stonewall Union v. City of Columbus*.[21] The Sixth Circuit found that the ordinance in *Stonewall* provided "objective and definitive standards related to traffic control to guide the licensing authority and prevent unfettered discretion."[22]

Defendant also cites to *Sullivan v. City of Augusta*,[23] in which the First Circuit was

---

[17] *Id*. at § 19-633(a).

[18] *Id*. at § 19-636(b).

[19] *Id*.

[20] 505 U.S. 123 (1992).

[21] 931 F.2d 1130, 1134-6 (6th Cir. 1991).

[22] *Id*. at 1135.

[23] 511 F.3d 16, 34-8 (1st Cir. 2007).

confronted with a situation similar to the present one. The ordinance in question left some discretion to the police department to determine costs associated with traffic control and clean up. Plaintiffs in *Sullivan* complained that the City had failed to specify a precise formula to guide the police in making their cost assessments. The court found, however, that rather than a precise formula, which it questioned the feasibility of, "experienced, professional judgment would seem to be the most likely way to estimate how many extra officers will be needed" for traffic control.[24] Thus, while some discretion would be maintained by the police officers, per the First Circuit, discretion was both necessary and advisable, and thus, met the relevant constitutional hurdles imposed.

In reply, Plaintiffs note that the *Stonewall* decision was issued prior to the Supreme Court's holding in *Forsyth County*, which it argues is the leading Supreme Court case on discretion in the context of setting user fees for marches and parades. Plaintiffs appear to suggest that the portion of *Stonewall* relied upon by Defendant was effectively overturned by the Supreme Court in *Forsyth County*.

As for *Sullivan*, Plaintiffs largely ignore it, neglecting to distinguish the case from the present one, at least so far as the issue of the City's vesting of overly broad discretion in the chief of police is concerned.[25]

While both *Stonewall* and *Sullivan* are persuasive authority, this Court must consider their rationale in terms of the Supreme Court's ruling in *Forsyth County* and the particular facts

---

[24] *Id*. at 36.

[25] The Court notes that the *Sullivan* opinion was issued on December 14, 2007, less than a week before the hearing on this case.

presented in this case.

In *Forsyth County*, the Supreme Court observed that an ordinance "may not delegate overly broad licensing discretion to a government official."[26] The Court went on to state "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority."[27]

The language of San Antonio's ordinance is clearly more specific as to what costs are being charged for than the *Forsyth County* ordinance, which was found to vest too much discretion in a government official. That ordinance broadly stated that "the Administrator shall adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed."[28] San Antonio's ordinance, on the other hand, specifies that permit holders are responsible for the costs of providing traffic control and clean up along the procession route. The amount of these costs are to be determined based on the following articulated factors: "the proposed route, time of day, time of year, and anticipated number of individuals in procession."[29]

Nevertheless, while more specific guidance is provided in the San Antonio ordinance than in the one struck down in *Forsyth County*, the question remains whether the final decision

---

[26] 505 U.S. at 130.

[27] *Id.* at 131.

[28] Section 3, subsection 6 of Forsyth County Ordinance No. 34, as amended (*See* United States Supreme Court Petitioner's Brief, 1992 WL 525738, at XI).

[29] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(b) (2007).

on costs is left "to the whim of the administrator."[30] Relevant to this inquiry is whether the administrator, here the chief of police and his designees, relies on narrow, objective written policies in setting costs. Furthermore, in the event the assessed costs are challenged, is there an appeal procedure in place to review the bases for the calculations made.

A closer look at the San Antonio ordinance reveals that it provides little guidance for determining how the factors it articulates, such as the proposed route and time of day, should lead to the generation of specific dollar values. The ordinance also does not enunciate protections to ensure the factors are applied equally to different groups. In other words, it is not clear from the text of the ordinance how a police officer is to translate factors such as the proposed route into specific dollar estimates, nor is there any assurance that an officer will apply the same rate for a particular route to similarly situated groups whose demands on public resources are the same, but whose message content is different.

Just as importantly, if not more so, such assurance appears to be lacking in the police department's own policies for administrating the ordinance. The number of safety officers deemed necessary for an event is one of the highest costs charged to a procession's organizers. Nevertheless, one of the chief of police's designated agents for determining how much to charge procession permittees acknowledged that no written policy exists to guide this determination.[31]

_____

[30] Thomas v. Chicago Park District, 534 U.S. 316, 324 (2002) (quoting *Forsyth County*, 505 U.S. at 133).

[31] Transcript of December 20, 2007 Hearing at 87-8. The Court asked Officer Jenkins how he calculated the number of officers needed at an event, specifically inquiring whether he used "some kind of a set formula or . . . policy." His reply was, "Basically, about 16 years of traffic experience." The Court followed up by asking, "So, then, is the answer, there is no written policy? You are drawing upon just your estimation?" Officer Jenkins responded, "That is correct."

Rather, officers are left to rely on their subjective experiences in setting costs. While it is reasonable, even desirable, to allow officers to apply their experience-based expertise in this process, such expertise needs to be combined with written policies that provide a check against the inherent risks to First Amendment freedoms caused by well-intentioned, but unrestricted discretion being placed in the hands of a few individual officers. With written policies that carefully guide officers' discretion, effective means exist to evaluate the decisions of the officers with respect to groups with different message contents.

Additionally, while the ordinance does provide for an appeals process for *total* denial of procession permits, there is no indication that it provides for a review or appeal of the *costs* assessed against a procession applicant who is granted a permit. As the *Forsyth County* Court noted when facing a similar shortcoming, neither "the law [n]or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees."[32] In other words, if the chief of police or his designee chooses to favor one group over another, there is not a clear process for discovering or challenging this constitutional discrimination, so long as the permit is not denied in its entirety.

Admittedly, the text and administration of the ordinance presents a close call on the question of whether too much discretion rests with the chief of police. There is no evidence suggesting the chief of police has engaged in content based discrimination. But the concern here is not with whether such discrimination has occurred, but whether an unconstitutionally high risk exists that it could. Setting out exactly what a constitutionally permissible ordinance would say is the task of the legislative branch of government. That said, the chief defects with the current

---

[32] 505 U.S. at 133.

ordinance are failure to require the chief of police to devise written guidelines on which to rely to at least some significant degree in determining the number of safety officers and traffic barricades needed for a procession,[33] along with the absence of a clearly stated appeals process for challenging the costs assessed against a group, even when its application for a permit is not denied. The Court holds that the City must address these defects in the ordinance before the ordinance can pass constitutional muster.

Chief of Police's Discretion to Charge for Security Costs

Plaintiffs also assert the ordinance is unconstitutional because it purportedly instructs the chief of police to engage in content-based discrimination by charging event organizers for security costs.

In *Forsyth County*, the Supreme Court encountered an ordinance that permitted the administrator to assess a fee to cover "the cost of necessary and reasonable protection of persons participating in or observing said . . . activit[y]."[34] The problem, the Supreme Court found, was that this provision tied costs "with the public's reaction to the speech, [and] listeners' reaction to speech is not a content-neutral basis for regulation."[35]

The alleged problem language in the San Antonio ordinance is as follows: "Traffic

---

[33] To be clear, the Court is not suggesting that all discretion should be removed from the police department in assessing costs. Such a requirement would be both unfeasible and undesirable. Given the multitude of moving variables that must be considered in making cost determinations, the relevant safety and traffic control experiences of the officers constitute an invaluable contribution to the process. Where, as here, the ordinance and its administration stride the fence of constitutionality, however, the Court thinks it best to err on the side of protecting fundamental constitutional liberties by requiring appropriate safeguards to be adopted.

[34] 505 U.S. at 134.

[35] *Id.*

control personnel shall be in a number sufficient to adequately safeguard the *safety of the event participants and the general public*, as determined by the chief of police."[36] Because procession organizers are charged for traffic control personnel, and traffic personnel are responsible for the safety of event participants and the general public, Plaintiffs argue organizers are being impermissibly charged for content-based security costs.

Defendant asserts, however, such is not the case. While the ordinance itself may be ambiguous, the City contends the way it is administered is not. Although charges are assessed for traffic control costs, Defendant unwaveringly maintains that traffic control does not cover security costs, the latter of which it claims never to have charged organizers for.[37]

Furthermore, so as to remove any ambiguity on the matter, Defendant has volunteered to amend the language of the ordinance to clarify that procession organizers will only be charged for traffic control, not security.[38]

In reply, Plaintiffs argue that merely changing the language of the ordinance is not

---

[36] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(b) (2007) (emphasis added).

[37] Transcript of December 20, 2007 Hearing at 121-2.

[38] Docket No. 31 at 9-10. Defendant, upon approval of the Court, has agreed to amend the ordinance as follows:

Section 19-630 - Definitions: "Traffic Control Personnel" shall mean certified peace officers engaged to provide control of the flow of both non-participant and participant pedestrians and vehicles so as to minimize traffic congestion and to maintain traffic flow at permitted events.

Section 19-636 - Duties of and Costs to Be Paid by Permit Holder (Subsection (b), paragraph 3 will be amended, in pertinent part, to read as follows): Traffic control personnel shall be in a number sufficient to adequately safeguard the flow of both participant and non-participant traffic in order to minimize congestion, as determined by the chief of police. **Any additional costs for police personnel deemed necessary to provide security due to the nature of the event will not be assessed to the permit holder**. (emphasis added).

enough. According to them, the police department has failed to evince any practice, either in the past or currently, of distinguishing between traffic control and other police functions with respect to marches and parades. In other words, absent a clear showing that the police department is organized to properly make the distinction between traffic control and security, Plaintiffs argue amending the ordinance by itself will only protect constitutional rights in form, not substance.

There exists the larger question of whether a full distinction between traffic control and security can be made. The ordinance states that "traffic control personnel shall be limited to the furthest extent practicable to city uniformed police officers, and may include . . . certified peace officers knowledgeable of traffic control laws."[39] In other words, traffic control is being provided by police officers and peace officers, the very same folks tasked with providing security. It seems reasonable to assume that the same officer who provides traffic control assistance one minute could well be providing security the next. The duality of roles is inherent in the nature of police work. Given that a virtually inevitable overlap exists between the provision of traffic control and security services, it is certainly possible that an officer being paid by event organizers to provide traffic assistance may have to respond to a security concern created by a non-peaceful reaction to the message that a group is presenting. In such a situation, the event organizers are technically paying for an officer to provide traffic assistance *and* security.

It is unrealistic, however, to expect that a traffic control officer, when confronted with threatening responses from the observing crowd, will standby and do nothing simply because he is being paid solely to assist the safe flow of traffic. The real question then for the Court is whether, in a given situation, the chief of police determines during the planning stages of an

---

[39] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(b) (2007).

-14-

event that, based solely on traffic control needs, the presence of an officer at a march or parade is necessary. If so, then her costs can be chargeable to event organizers, even if such officer ends up being unexpectedly forced to provide security due to a hostile reaction from bystanders. If, however, during the planning stages the chief of police determines that traffic control alone does not justify the officer's presence, the City cannot assess the cost of the officer to event organizers, regardless of what services the officer actually ends up performing.

In sum, while the text of the current ordinance is ambiguous, there is no evidence that the police department interprets it to allow security costs to be impermissibly assessed against event organizers. To be sure no confusion lingers on this point, however, the Court orders that the ordinance be amended to make clear that event organizers will not bear the responsibility for unconstitutional security related costs.

City Council's Discretionary Favoring of Certain Events

Plaintiffs take issue with the decision of the city council to absorb the traffic control costs for three handpicked events: the Diez y Seis Parade, the Martin Luther King March, and the Veterans Day Parade.[40] According to Plaintiffs, the City's decision to subsidize costs for certain groups' speech, but not others', is impermissible content/viewpoint discrimination.

In response, the City asserts it can favor certain groups' speech so long as they do not inhibit or restrict the speech of others. Phrased differently, the City argues it can selectively subsidize certain groups to foster particular governmental aims as long as it does not single out and suppress disfavored views.

---

[40] Plaintiffs allege that the city council intends to provide cost exemptions for additional events, but as such alleged exemptions have not yet been granted, the Court considers only the three events specifically mentioned in the ordinance.

Courts often begin their analysis of free speech cases by setting forth a general framework. For example, in a 1981 Fifth Circuit case, the court began by observing that "differential treatment of groups based on the content of their speech is established to be unconstitutional."[41] As a general principle, this is true. As with most general principles, however, it has been qualified over time. One such qualification is for government speech. In a line of cases originating with *Rust v. Sullivan*,[42] the Supreme Court has distinguished between the government's right to favor certain speech over others when it is the speaker versus when it is not.

When government speech is at issue, the Court has held that "viewpoint-based funding decisions can be sustained."[43] Such otherwise impermissible discrimination also applies in instances, like in *Rust*, "in which the government use[s] private speakers to transmit specific information pertaining to its program."[44]

In addition to being able to make content or viewpoint based funding decisions when it comes to its own speech, the government may subsidize non-governmental speech based on a desire to favor certain classifications of speakers. In *Regan v. Taxation with Representation of*

---

[41] Beckerman v. City of Tupelo, Mississippi, 664 F.2d 502, 514 (5th Cir. Unit A Dec. 1981).

[42] 500 U.S. 173 (1991).

[43] Legal Services Corp. v. Velazquez, 531 U.S. 533, 541 (2001).

[44] *Id*. In *Rust*, the Court found that the government's funding of certain programs, but not others, did not even qualify as viewpoint discrimination. According to the Court, "the Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government *has not discriminated on the basis of viewpoint*; it has merely chosen to fund one activity to the exclusion of the other." (*Rust*, 500 U.S. at 193) (emphasis added).

*Washington*, the Supreme Court upheld a law which effectively subsidized the lobbying efforts of

veterans' groups without providing similar subsidies to other non-profit entities.[45] In reaching its

conclusion, the Court observed that veterans' organizations were entitled to the tax-based subsidy

"regardless of the content of any speech they may use."[46] While not addressing how it would

approach a situation where the government took content or viewpoint into consideration when

subsidizing non-governmental speech, the Court did note that "the case would be different if

Congress were to *discriminate invidiously in its subsidies in such a way as to aim at the*

*suppression of dangerous ideas*."[47]

Indeed, this dicta in *Regan* has been built upon in subsequent cases. Surveying the

_____

[45] 461 U.S. 540 (1983). The Plaintiff in *Regan* challenged denial of its tax exempt status after it was found to be engaging in substantial lobbying activity. Plaintiff also challenged Congress' exemption of veterans' organizations from the restriction on using tax exempt dollars for lobbying. The Court held that the restriction on tax exempt status for lobbying in general did not violate the First Amendment, nor did the exception to the law for veterans' organizations violate equal protection.

Amicus attempts to distinguish the present case from *Regan* by alleging that unlike in that case, which purportedly only involved the subsidization of certain groups' First Amendment rights, the ordinance in this case "restricts the exercise of those rights for all, then eliminates the restriction for a select few." (Docket No. 36 at 9).

By "restricts," Amicus refers to the imposition of traffic control and clean-up costs on groups who choose to use the public streets to voice a message. Assuming for the moment that these costs are narrowly tailored to cover only actual expenditures made by the City on behalf of groups wishing to access the public streets (an issue addressed later in the Order), this assessment of costs is no more a "restriction" than the taxes complained of by the Plaintiff in *Regan*. In other words, if the Supreme Court did not find that the government's decision to tax lobbying activity was a restriction of the type Amicus complains of, this Court cannot see how the City's decision to require payment of the reasonable and necessary costs it must expend to provide basic traffic control and clean-up services can be characterized as such a restriction. In short, the Court does not adopt Amicus' reasoning for attempting to differentiate the scheme in *Regan* from the one established by the City.

[46] *Regan*, 461 U.S. at 548.

[47] *Id*. (emphasis added).

-17-

development of the law regarding government speech versus non government speech, the
*Velazquez* Court stated that "neither the latitude for government speech nor its rationale applies
to subsidies for private speech in every instance."[48] Referring to its holding in *Rosenberger v.
Rector and Visitors of University of Virginia*,[49] the Court observed, "it does not follow that
viewpoint-based restrictions are proper when the government does not itself speak or **subsidize
transmittal of a message it favors** but instead expends funds to encourage a diversity of views
from private speakers."[50]

    In other words, the government's actions vis-a-vis the speech it favors or disfavors must
be considered within the larger context of the particular government program or project at issue.
In instances in which the government has created a limited forum for speech, it "may not exclude
speech where its distinction is not reasonable in light of the purpose served by the forum."[51]
Thus, in *Rosenberger*, the Court found that viewpoint-based restrictions are not "proper when the
University does not itself speak or subsidize transmittal of a message it favors but instead
expends funds to encourage a diversity of views from private speakers."[52]

    Plaintiffs rely primarily upon the holding in *Rosenberger* to argue that the City's new
ordinance unconstitutionally discriminates between groups. In *Rosenberger*, however, the
University of Virginia expended funds to *facilitate* speech, not *promote* a message. As the Court

---

[48] 531 U.S. at 542.

[49] 515 U.S. 819 (1995).

[50]  *Velazquez*, 531 U.S. at 542.

[51] *Rosenberger*, 515 U.S. at 829.

[52] *Id*. at 834.

showed, the University made abundantly clear that its decision to fund speech did not imply any form of endorsement as to the content of the speech.[53] Thus, the Court emphasized that its "holding that the University may not discriminate based on the viewpoint of private persons whose speech it **facilitates** does **not** restrict the University's **own speech**, which is controlled by different principles."[54]

Hence, we have come full circle, back to the question of how to characterize the City's position vis-a-vis the speech of the three groups whose traffic control costs it subsidizes. The Supreme Court has not yet clearly demarcated the boundaries of government speech versus non government speech. As a result, it is helpful for the Court to ask whether the City is more like the university in *Rosenberger* that facilitates speech regardless of viewpoint or like the federal government in *Rust* that wishes to promulgate a particular message and chooses private groups through which to do it. According to the language of the new ordinance, the answer is the latter. As the ordinance states, the City has chosen to absorb the traffic control costs for three events because of such factors as their "broad appeal, historic tradition, [and] cultural significance."[55]

---

[53] The Court observed that a "standard agreement signed between each CIO [Contracted Independent Organization] and the University provides that the benefits and opportunities afforded to CIO's 'should not be misinterpreted as meaning that those organizations are part of or controlled by the University, that the University is responsible for the organizations' contracts or other acts or missions, or that the University approves of the organizations' goals or activities.'" (*Id*. at 824).

[54] *Id*. at 834 (emphasis added).

[55] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(c) (2007). While the City does not explicitly state the message it is supporting, it appears the message relates broadly to appreciation of the diverse heritage of the City's citizenry, respect for all people regardless of race, and recognition of the services and sacrifices made by members of the armed forces.

As a general matter, local government leaders attempt to discern and address the issues important to their community. They must make choices about where to prioritize limited city resources and attention. For example, schools must decide which courses to offer students,

By choosing to subsidize these events, the City is not attempting to "encourage a diversity of views" like in *Rosenberger* or "facilitate private speech" as in *Velazquez*, but is seeking to "promote a governmental message" as in *Rust*.[56]

A response to this argument is that the more important inquiry is to examine the primary,

---

recognizing that even if they wanted to, they could not offer classes on all subject matters. Thus, a school may have to decide whether to offer a European history or an Asian history course. Likewise, the foreign language department may have to decide whether to offer students the option of French classes or Russian. In choosing one course over the other, a school district representative may take content into consideration, such as whether one language seems more economically or politically vital than another, or whether one continent's history is more crucial to students' overall education than a competing continent's.

Similarly, a City may choose to address one type of problem in the community without having to address all problems. The city council may determine that childhood obesity is a problem of particular concern in the community. To combat the problem, the City might implement and fund a series of new programs designed to educate and inform parents, teachers, and children about the importance of eating and exercising right from a young age. The City would certainly be permitted to do this, even if it did not spend comparable resources addressing the pernicious health consequences of tobacco use. Under *Rust* and its progeny, if the City can directly promote a message, it also has the option of subsidizing private groups to proclaim that message. Thus, because the City could directly organize a march raising awareness about the negative consequences of childhood obesity, it could also subsidize a march organized by the American Heart Association to convey the same message. And just as the American Cancer Society could not require the City to organize a stop smoking march simply because it organized a march on childhood obesity, the American Cancer Society could not require the City to subsidize its march merely because it choose to subsidize the American Heart Association's march.

A City is not, however, entitled to unlimited discretion in determining the messages it wishes to promote. As one Supreme Court Justice has noted, "I suppose it would be unconstitutional for the government to give money to an organization devoted to the promotion of candidates nominated by the Republican Party - but it would be just as unconstitutional for the government itself to promote candidates nominated by the Republican Party, and I do not think that that unconstitutionality has anything to do with the First Amendment." (National Endowment for the Arts v. Finley, 524 U.S. 569, 599 n. 3, (1998) (Scalia, J., concurring). In other words, the message, whether promoted directly by the City or through a City provided subsidy to a private organization, must meet the requirements of the entire Constitution. Because Plaintiffs bring a facial challenge, the Court need only consider the messages promoted through the three named events in the ordinance. Should the City choose to expand the list of events for which subsidies are provided under the ordinance, Plaintiffs might have cause to bring a new constitutional challenge.

[56] *Velazquez*, 531 U.S. at 542, 534.

overarching purposes of the total ordinance, not just one provision. While the ordinance does not

explicitly state what these general, overarching purposes are, it is reasonable to conclude from an

examination of the text that its aims are to provide for a safe, organized system of granting access

to the public streets, to ensure that at least a portion of the costs the City pays for assisting with

public processions is recouped, and to provide a general subsidy to all First Amendment

processions to reduce their barrier of access to the streets. Looking solely at these larger

purposes, Plaintiffs could reasonably contend that the purpose of the ordinance is not to promote

a particular message, but to regulate access to the streets for all groups, regardless of message. In

this sense, they could plausibly contend the case more closely approximates the government

programs at issue in *Rosenberger* and *Velazquez* than in *Rust*.

        In sum, if the subsidization provision is considered as a separate program or initiative

from the larger parade ordinance, then the content and viewpoint-based favoritism is more akin

to the government's promotion of speech in *Rust*. If, however, the subsidization provision is

viewed as part of a larger effort to objectively facilitate and regulate speech, it cannot be said to

further such goals, just as the University's discrimination against religious viewpoints in

*Rosenberger* was found not to comport with its broader efforts to encourage a diversity of

viewpoints.

        One might be tempted to think a simple way of resolving the problem would be to say

that because the subsidization provision is found within the parade ordinance, it should be

viewed within the context of the ordinance as a whole. The problem with such an approach is

that the City could simply pass a new ordinance that addresses only the subsidization of the three

events. Such a basic procedural shift should not and does not dispose of the underlying

constitutional question.

Rather, it is helpful to take a step back and place the subsidization provision within the context of larger principles articulated by the Supreme Court. First, the Court in *Regan* made clear that the government has no duty to subsidize speech. Like the Plaintiffs in this case, Taxation with Representation of Washington alleged they could more effectively exercise their free speech rights if the government subsidized them, which in that case meant allowing them to lobby with tax-deductible contributions. While the Court agreed that such subsidization would enable them to carry out their First Amendment activity more effectively, it rejected "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State."[57]

Second, the City has demonstrated a two-fold objective with respect to groups wishing to exercise their First Amendment rights on the public street. It wishes to help all groups, regardless of content, have greater capacity to exercise their freedom of speech rights. That is why it agrees to absorb the first $3,000 in traffic control costs. It also wishes to help a few specific groups promote a message that it supports, hence the absorption of all traffic control costs for those groups.

In other words, the City need not specially support any event. Nevertheless, it has opted to support all First Amendment events to a set level. It then has chosen to support a few groups up to that level, and potentially, beyond. It has done so because those selected events promote a message which the City endorses. The decision to favor the selected events more than the City already favors other events in no way disadvantages the other events, which have no claim to any

---

[57] *Regan*, 461 U.S. at 546.

subsidization in the first place.[58] Assuming the City can charge event organizers for traffic control costs, an assumption that is contested and will be examined below, event organizers are responsible for those costs just as they are for any other costs associated with promulgating a message. The fact that a group has a constitutional right to voice an opinion does not mean they have a constitutional right to have the government fund their expression of it. Thus, the government's decision to financially support one group's opinion because it is a message the government, in its discretion, supports, in no way harms another group nor diminishes that group's constitutional right to freedom of expression.[59]

---

[58] Along these lines, the Supreme Court has stated "where governmental provision of subsidies is not aimed at the suppression of dangerous ideas, its power to encourage actions deemed to be in the public interest is necessarily far broader." (*Id*. at 550).

[59]Plaintiffs cite to language in *Thomas v. Chicago Park District* to argue that the City simply cannot favor the speech of some groups over others. (534 U.S. 316 (2002)). In that case, the Court observed in passing that "granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional." (*Id*. at 325).

What the Court is referring to, however, is clearly distinguishable from the subsidy scheme in this case. In *Thomas*, the Court was considering the constitutionality of a municipal park ordinance that required individuals to obtain a permit before conducting events involving more than fifty people. When the Court referred to waivers, it meant waivers from having to comply with the requirements necessary to obtain a permit, not waivers for certain costs that might be associated with an activity *after* a permit had been granted. In other words, *Thomas* is concerned with the granting or denial of permits needed to exercise basic First Amendment rights. In this case, the City's subsidization of certain groups has nothing to do with a group's right to exercise its rights. In fact, the issue of subsidies only comes into play *after* a group has been granted a permit to exercise their First Amendment rights via a march or parade. Rather, a waiver or subsidy in this case concerns whether the government or the event organizer will be responsible for traffic control costs.

Because the government has no obligation to subsidize a group's speech, the fact that it does not provide such subsidies for some groups does not infringe their constitutional rights. In contrast, the granting or denial of permits in *Thomas* did not concern the funding source for already approved First Amendment activities but whether the City would even permit such activities to take place. There is a vast constitutional difference between permitting groups access to public places for free speech activity and making discretionary decisions about whether to cover the costs of such activity with taxpayer dollars.

Underscoring this distinction is the fact that the *Thomas* language cited to by Plaintiffs was

It is one thing when the government chooses to promote a particular message; it is quite another when it seeks to restrain the expression of a message.[60] Supreme Court case law is particularly concerned with ensuring that the government does not "discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas."[61] Nothing in this case suggests the City's subsidy decisions concern the suppression of dangerous ideas, disfavored ideas, or any ideas at all. Rather, the sole purpose is to advance certain messages, which the City has opted to do through funding private groups rather than directly promulgating such messages itself. The courts have provided wide latitude for such activity.[62] After all, when the City speaks, either through itself or through private parties it funds, "it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected

_____

written by Justice Scalia. Four years earlier in *Finley*, however, Justice Scalia made plain that "it is the very business of government to favor and disfavor points of view on . . . innumerable subjects . . . I regard the distinction between 'abridging' speech and funding it as a fundamental divide, on this side of which the First Amendment is inapplicable. . . The Government, I think, may allocate both competitive and noncompetitive funding *ad libitum*, insofar as the First Amendment is concerned." (*Finley*, 524 US at 598-9, Scalia, J., concurring).

[60] "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." (*Rust*, 500 U.S. at 193).

[61] *Regan*, 461 U.S. at 548. "It is preposterous to equate the denial of taxpayer subsidy with measures 'aimed at the *suppression* of dangerous ideas.'" (*Finley*, 524 U.S. at 596, Scalia, J., concurring) (emphasis original).

[62] Plaintiffs make much out of the fact that this case involves speech in a traditional public forum. But nothing in the Supreme Court's case law suggests that the principles underlying the government's right to support certain messages is limited to certain types of forums. Moreover, there is no indication that the government is attempting to dispel particular viewpoints from the public thoroughfares or invidiously punish disfavored ideas. Indeed, from a constitutional perspective, because the government need not subsidize speech in any forum, the fact it has not chosen to fully subsidize Plaintiffs' speech, regardless of what type of subsidy it provides to other groups, presents no constitutional wrong.

officials later could espouse some different or contrary position" and amend the parade ordinance accordingly.[63]

Therefore, the City's decision to subsidize the costs for the Deiz y Seis Parade, the Martin Luther King March, and the Veterans Day Parade is permissible as an extenuation of the government speech doctrine initially recognized by the Supreme Court in *Rust*.

City Council's Discretionary Exemption of Certain Categories of Events

Plaintiffs next contend the ordinance unconstitutionally excludes funeral processions and government agencies from having to comply with its requirements.[64] Plaintiffs cite to the Fifth Circuit case of *Beckerman v. City of Tupelo, Mississippi*[65] for the proposition that the City has failed to articulate a rational basis for the exclusion of these groups. In that case, the court examined a parade ordinance that required marchers to be "unarmed, line up no more than four abreast, in the right-hand lane of the street, in units of 100 or fewer, with fifteen foot intervals between units."[66] The professed purpose for these requirements was to preserve public safety, allowing marchers and vehicular traffic to safely share the roadways. The court found nothing per se wrong with these regulations. The problem was that students and governmental agencies were exempted. The court observed that "the groups excepted from the ordinance will create traffic

---

[63] *Velazquez*, 531 U.S. at 541.

[64] Unlike organizers of funeral processions or government agencies acting within the scope of their functions, the Deiz y Seis Parade, Martin Luther King March, and the Veterans Day Parade *are* subject to the permitting requirements of the ordinance. The only factor that makes these three events unique is that the City subsidizes their traffic control costs.

[65] 664 F.2d 502 (5th Cir. Unit A Dec. 1981).

[66] *Id*. at 513.

problems and threats to public safety . . . in exactly the same way any parade would."[67] It went on

to conclude that "because the City is so willing to disregard the traffic problems in those

circumstances, we cannot accept the contention that traffic control is a substantial interest. As

long as the exceptions remain in the ordinance, the regulations . . . constitute an unconstitutional

discrimination."[68]

  The Fifth Circuit recently reaffirmed this holding in *Knowles v. City of Waco, Texas*.[69]

Like here, the City of Waco's parade ordinance exempted funeral processions and governmental

agencies acting within the scope of their functions.[70] As in *Beckerman*, Waco justified the need

for its parade ordinance based on concerns for traffic safety. Thus, the Court found that "Waco's

claims that the exceptions to the parade ordinance are consistent with the ordinance's goal of

promoting traffic safety are not justified in distinction from *Beckerman*,"[71] and thus, held the

ordinance violated the First Amendment and the Equal Protection Clause.

  Defendant's response is primarily limited to a recitation of language from the Sixth

Circuit's decision in *Stonewall*.[72] Defendant makes no effort to distinguish the present case from

---

  [67] *Id*.

  [68] *Id*.

  [69] 462 F.3d 430 (5th Cir. 2006).

  [70] Unlike San Antonio's ordinance, it also exempted "students going to and from school classes or participating in educational or recreational activities under the immediate direction and supervision of the proper school authorities."(*Id*. at 432).

  [71] *Id*. at 437.

  [72] In that case, the court upheld the portion of an ordinance that exempted funeral processions from the permitting requirements imposed on parades. The court reasoned that "a funeral procession is not a parade because it does not require the closing off of streets, but requires only that the cars

the two on-point Fifth Circuit decisions. Like in those two cases, the ordinance here exempts whole categories of groups from its application, even though an important underlying purpose of the ordinance is to prevent traffic safety harms which these groups are no less susceptible to causing than the covered groups. In order to make such wholesale exclusions, the City must proffer a rational basis for the discrimination. Here, the City merely states the ordinance will not apply to certain groups, with no explanation of the basis for the exemption. Thus, although the undersigned agrees with *Stonewall* that a funeral procession is not the same as a parade, under Fifth Circuit precedent, the City's exemptions are unconstitutional.

Imposition of Costs for Access to a Traditional Public Forum and Availability of Ample Alternatives

**1) Imposition of Costs**

The ordinance regulates access to the public streets, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[73] Such regulations must be "content-neutral time, place, and manner restrictions"and "must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication."[74] As Plaintiffs acknowledge, "reasonable time, place, and manner restrictions

---

involved will be allowed to continue through red lights in order to keep the procession together. This procession does not interfere with the flow of traffic in the same way that a parade does, which requires the closing off of entire streets." (*Stonewall*, 931 F.2d at 1138).

[73] *Hague*, 307 U.S. at 515.

[74] *Thomas*, 534 U.S. at 323 n.3.

[can] include permit requirements."[75]

The new ordinance holds event organizers responsible for traffic control devices, traffic control personnel, and clean-up costs.[76] For First Amendment events, "the city shall absorb the first three thousand dollars ($3,000.00) of the traffic control device and traffic control personnel costs on behalf of the permit holder."[77]

Plaintiffs argue, however, that notwithstanding the $3,000 subsidy, the City's assessment of these costs is prohibitively high, denying them access to the public streets. Additionally, they contend that the City has failed to provide an adequate alternative to the traditional street march for groups, like themselves, that are unable to pay the costs imposed upon them.

What Plaintiffs ideally want is for the City not to assess traffic control and clean-up costs. Failing that, they want either the charge to be a nominal one[78] or for an indigency provision to be inserted in the ordinance providing for a waiver of fees for those groups that cannot afford them. In short, Plaintiffs want the City to subsidize their speech. The City, however, has no such

---

[75] Docket No. 34 at 2. Indeed, as far back as 1941, the Supreme Court made clear that "if a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place, and manner in relation to the other proper uses of the streets." (Cox v. State of New Hampshire, 312 U.S. 569, 576 (1941)).

[76] SAN ANTONIO, TEX., CITY CODE ch. 19, art. XVII, § 19-636(b) (2007).

[77] *Id.*

[78] Plaintiffs cite to the Eleventh Circuit's holding on nominal fees in *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir. 1985). There, the court, referring to the Supreme Court's opinion in *Cox v. New Hampshire*, stated, "we read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities. An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment."

obligation. While it has chosen to provide a considerable $3,000 subsidy for all First Amendment events, it is under no obligation to move this far, much less where Plaintiffs want it to go.

The Fifth Circuit has recognized that a governmental entity may charge a permittee for necessary expenses, even if the permit is for First Amendment activity.[79] Furthermore, the Supreme Court has made clear that these charges need not be nominal.[80]

This Court finds that the costs assessed by the City are "narrowly tailored" to serve the "significant governmental interest"[81] of covering the traffic control and clean-up costs generated by a particular event that a private group chooses to hold. Plaintiffs have failed to show how the City is charging for anything beyond the reasonable and necessary costs associated with providing basic vehicular and pedestrian traffic safety services plus the expected costs for clean-up. Someone has to pay for such services. Under Plaintiffs' theory, that someone should be the City, which means the taxpayers of the City.[82] The problem is that Plaintiffs seek to require the

---

[79] Fernandes v. Limmer, 663 F.2d 619, 633 (5th Cir. Unit A Dec. 1981).

[80] The Court has stated its precedent should not be interpreted to suggest that in the parade context, "only nominal charges are constitutionally permissible." *Forsyth County*, 505 U.S. at 137.

[81] *Id*. at 130.

[82] As for the number of times a group would be entitled to such taxpayer provided benefits, Plaintiffs seem to suggest the number could be limitless. At the hearing on December 20, 2007, the Court asked Plaintiffs' counsel how many times a group gets to march free at taxpayers' expense. While not directly answering the question, counsel suggested that such limiting factors as the administrative tediousness of applying for a permit and "the realities of organizing a parade" would act as self-checks against groups taking to the streets with great frequency. (Transcript of December 20, 2007 Hearing at 20-1). Such answer, however, avoids tackling the harder question of what happens when these factors do not have their supposedly limiting effect. For example, there is no shortage of issues concerning which a group may frequently wish to take to the streets until the government's policy on that issue changes. It would appear Plaintiffs's position is that the City should be required to cover the traffic control and clean-up costs of such group without limit.

City to do what the Supreme Court has held it does not have to do: subsidize speech.[83]

At the hearing, Plaintiffs sought to show that other cities do subsidize speech by absorbing traffic control and clean-up costs. These cities are certainly entitled to do so. But what some cities choose to do in their political discretion has no bearing on what the law requires this City to do. Because the law does not require cities to subsidize speech, Plaintiffs' efforts to compel the City of San Antonio to pay for theirs must fail.

**2) Availability of Ample Alternatives**

According to Plaintiffs, even if the City need not subsidize speech for those groups that can afford the traffic control and clean-up costs, it should be required to subsidize those costs for indigent groups.

At first blush, such argument has appeal. Given the fundamental importance of preserving freedom of speech for all, requiring the government to absorb the costs for groups with insufficient funds may seem like a reasonable suggestion. The simplistic allure of such a proposal, though, is misleading. Defining indigency in the context of groups is a daunting task. Consider for example a well-funded, well-known group. It could easily form a spin-off group whose sole purpose is to plan marches in support of various causes which the main group's membership supports. Unlike the main group, however, the spin-off group would undertake no fund raising efforts, keeping only sufficient funds to cover minimal operating expenses. When it applies for a parade permit, should it be considered an indigent group? After all, it presents itself as a separate group from the main, well-known organization. It is not clear on what grounds the City could reject its application of indigency.

---

[83] *See Regan*, 461 U.S. 540.

Furthermore, smaller or recently formed organizations may not yet have separately established group bank accounts. In such situations, how should indigency be determined? Or as a corollary, what about situations where the permit applicants are not formally established organizations, but groups of people who temporarily unite around a specific issue. How is indigency to be determined then? Does each member of the ad hoc group have to submit detailed personal financial records to document the exact amount of liquid assets he or she has? If not, must the City presume that every ad hoc group that wishes to organize an event is indigent because there is no group account from which funds can be withdrawn to pay the charges assessed?

And with all groups, what role does discretion play in calculating indigency? For example, consider a group that wishes to host a march in support of raising the minimum wage. The group has $2,000 in its bank account. After the $3,000 subsidy provided by the City is taken into consideration, the total traffic control cost owed is $1,500. Because the group has more than $1,500 in its account, it is arguably not indigent.

But let's say the group wants to advertise its event in the local newspapers and print media. The group also decides that in order to notify and rally its membership, it needs to mail them pamphlets so they can put the march on their calendars. Let's further say the group wants to create large banners and posters to carry along the march route so as to attract the most attention to the message it is promoting. The total cost for these preparatory and publicity actions depletes the group's $2,000 budget. Should the group now be considered indigent because it cannot afford the $1,500 charge for traffic related costs? If so, then it would appear a group's alleged indigency could be the result of its deliberate decision to spend money on all costs *but* those owed to the

City. If not, then it would appear the government would be forced to make determinations about whether groups made appropriate or prudent discretionary expenditure decisions, an inquiry no group would readily have the government make, nor one the government is likely to want to undertake.

These questions, and others like them, are fraught with complexity and provide insight into why the City may have decided to avoid establishing such a difficult to administer indigency exception.[84]

Regardless of these practical reasons for not including an indigency provision in the ordinance, the City's decision rests squarely on sound constitutional law. Plaintiffs' demand for an indigency exception would force the government to subsidize a private party's speech, which the Constitution simply does not require it to do. So long as adequate alternative forums are made available for so-called indigent groups to express their views, the City is not required to subsidize, through general taxpayer dollars, the costs of public street processions for private groups.[85]

_____

[84] As the First Circuit stated in *Sullivan v. City of Augusta*, "it is obviously not simple to select out those people and causes whose indigency is such as to warrant giving them, as it were, a free pass. . . Whether a particular city, like Augusta, wishes to enact and deal with the administration of such an exception is up to it and its government." (511 F.3d at 45).

[85] *See Sullivan,* 511 F.3d 16 and *Stonewall*, 931 F.2d 1130. Amicus sites to language in *Walsh* that reads "indigent persons who wish to exercise their First Amendment rights of speech and assembly and as a consequence of the added costs of police protection, are unable to pay such costs, are denied an equal opportunity to be heard." (774 F.2d at 1523). The *Walsh* court went on, however, to state that the "the granting of a license permit on the basis of the ability of persons wishing to use public streets and parks to demonstrate, to pay an unfixed fee for police protection, *without providing for an alternative means of exercising First Amendment rights*, is unconstitutional." (*Id*. at 1523-4) (emphasis added). Hence, the language from *Walsh* does no more than direct the Court to explore whether adequate alternatives are available to allegedly indigent groups.

With respect to alternative forums for communication, "while the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."[86] Plaintiffs argue that sidewalk or park marches, which do not require permits under the ordinance, are not adequate alternatives.

The City's response is two-fold. First, it asserts that there are a number of potential procession routes, including some downtown, that could be utilized for less than $3,000 in traffic control costs.[87] This means that with the City's $3,000 subsidy, First Amendment processions could be conducted on the streets free of any charges from the City, save those related to clean up. Alternatively, the City contends that sidewalks or parks provide an adequate alternative to the public streets.

Starting with the question of whether sidewalks and parks present an adequate alternative to public streets, two circuits that have directly addressed the issue have held that they do. In *Stonewall*, the Sixth Circuit held that "ample alternative channels of communication" exist when groups "are free to use the sidewalks . . . [and] parks" free of charge for their marches.[88] Likewise, in *Sullivan*, the First Circuit, faced with an analogous situation, sided with the *Stonewall* court in concluding that sidewalks do provide an adequate alternative. The court reasoned that "an ordinance does not fail for lack of adequate alternatives so long as there are

---

[86] *Knowles*, 462 F.3d at 434.

[87] Transcript of December 20, 2007 Hearing at 14.

[88] 931 F.2d at 1134.

avenues for the general dissemination of a message."[89]

Like the ordinances in *Stonewall* and *Sullivan*, the City's ordinance does not require permits for sidewalk processions.[90] In those two cases, the courts found that the cities provided ample alternatives to speech largely based on the availability of sidewalks. In this case, the City of San Antonio goes further. In addition to providing access to sidewalks and parks free of charge, the City subsidizes the first $3,000 in traffic control costs for First Amendment processions. According to the City, this subsidy is sufficient to provide many groups with access to the public streets, including some downtown routes, for no charge other than clean-up costs.[91]

In other words, San Antonio has gone further than its sister cities in *Stonewall* and *Sullivan*, both of whose ordinances were held by circuit courts to provide ample alternatives. While decisions of the Sixth and First Circuits are not binding on this Court, they are persuasive. Finding the reasoning in those cases to be sound, and applying such reasoning to the facts of this case, the Court concludes that the City has provided ample alternatives of communication for those groups whose traffic control costs exceed $3,000 and who cannot afford the difference.[92]

---

[89] 511 F.3d at 44.

[90] Amicus argues that the "ordinance is so vaguely worded that no group could process down the sidewalk with any certainty that a permit was not required of them." (Docket No. 36 at 22). The City has made clear, both in its briefs and at the December 20th hearing, that sidewalk processions do not require permits. The *Sullivan* court faced the same disagreement in interpretation between the government and the ordinance challengers. On a facial challenge, this Court, like that court, finds "no reason to reject the City's insistence that sidewalk parades do not require permits." (*Sullivan*, 511 F.3d at 42.

[91] Transcript of December 20, 2007 Hearing at 14.

[92] The Court's holding is not meant to suggest that a sidewalk march is identical in all respects to a street march. In *Sullivan*, the Plaintiffs argued "that sidewalk marches have less symbolic significance and provide logistical challenges because sidewalks are narrower and prevent

<u>Preliminary Injunction</u>

Because Plaintiffs seek a Preliminary Injunction, they have the burden of establishing 1) a substantial likelihood of success, 2) a substantial threat of irreparable harm, 3) that the threatened injury to them outweighs any threatened harm to the Defendant, and 4) that granting the injunction will not disserve the public interest.[93]

Plaintiffs have demonstrated a substantial likelihood of success on their claims that the ordinance, as currently enacted, is unconstitutional for 1) granting the chief of police overly broad discretion in assessing costs, 2) not clearly distinguishing between traffic control and security costs, and 3) exempting funeral processions and government agencies operating within the scope of their functions.

Having established the substantial likelihood of such constitutional violations, Plaintiffs have demonstrated a substantial threat of irreparable harm, as they have indicated an intent to apply for a permit to hold a march on or around International Women's Day on March 8, 2008.

---

the carrying of large banners." (511 F.3d at 42). Plaintiffs in this case make similar arguments. They also assert that "sidewalks are either inaccessible or much more difficult for people in wheelchairs; . . . are unsafe for crowds of people trying to cross intersections; . . . inevitably inconvenience pedestrians and often lead to altercations; . . . [and] in many parts of the City, there are no sidewalks." (Docket 34 at 10).

While these realities must be considered, the mere fact that there are differences between streets and sidewalks is not dispositive. The City is not required to provide identical alternatives. Rather, the question is whether an adequate alternative exists through which parties can voice their views. Sidewalk processions can draw considerable public attention, enabling groups to rally supporters and compellingly disseminate their message, as well as make a symbolic statement.

Placing Plaintiffs' complaints within the larger framework of constitutional analysis, this Court, like the First and Sixth Circuits before it, finds that sidewalks, despite some of their setbacks, provide a constitutionally acceptable alternative for engaging in First Amendment freedoms of expression.

[93] Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 572-3 (5th Cir. 1974).

Because of the constitutional problems currently present in the ordinance, Plaintiffs' application would likely be subject to the First Amendment dangers posed by the ordinance's constitutional inadequacies unless the Court intervenes.

The threatened injury to Plaintiffs is a restriction or deprivation of their First Amendment freedom of speech rights. Such threat outweighs the potential harm to the City, which would be the burden of subsidizing the costs of marches and parades that take place during the time between the issuance of this Order and a finding that the City has corrected the constitutional defects noted herein.

Finally, granting the preliminary injunction will serve the public interest by protecting permittees from application of an unconstitutional ordinance and encouraging the City to take swift action to correct the constitutional inadequacies of the present ordinance.

## Conclusion

The Court finds that the ordinance is unconstitutional for three separate reasons. First, it vests too much discretion in the chief of police to determine the costs assessed against permittees. Second, it does not clearly distinguish between traffic control costs, which can be assessed, and security costs, which cannot. Finally, it impermissibly exempts funeral processions and governmental agencies.

The Court does not find that the ordinance's provision for the subsidization of the three specified events is unconstitutional, nor does it strike down the City's requirement that permittees pay for traffic control and clean-up costs. As for indigent groups, the Court finds that the City has arranged for ample alternatives.

For these reasons, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for

Preliminary Injunction (Docket No. 2).

It is so ORDERED.

SIGNED this 21st day of February, 2008.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE